No. 23-55757

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTH RIVER INSURANCE COMPANY,

*Appellant,*

*v.*

JAMES RIVER INSURANCE COMPANY,

*Appellee.*

On Appeal from the United States District Court for the Central District of California, Hon. Philip S. Gutierrez, Case No. 23-cv-00027-PSG-E

## APPELLANT'S OPENING BRIEF

Sabrina H. Strong
sstrong@omm.com
Zoheb P. Noorani
znoorani@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Attorneys for Appellant The North River Insurance Company*

**CORPORATE OWNERSHIP STATEMENT OF THE NORTH RIVER INSURANCE COMPANY**

The North River Insurance Company, a New Jersey corporation, is wholly-owned by United States Fire Insurance Company, a Delaware corporation, which is wholly-owned by Crum & Forster Holdings Corp., a Delaware corporation, which is wholly-owned by Fairfax (US) Inc., a Delaware corporation, which is substantially owned by FFHL Group Ltd., a Canadian company, which is wholly-owned by Fairfax Financial Holdings Limited, a Canadian public company.

Dated: December 6, 2023

O'MELVENY & MYERS LLP

By: _/s/ Sabrina H. Strong_
Sabrina H. Strong
Zoheb P. Noorani
400 South Hope Street
Los Angeles, CA 90071

*Attorneys for The North River Insurance Company*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..........................................................1

STATEMENT OF JURISDICTION....................................................5

ISSUES PRESENTED ......................................................................6

STATEMENT OF THE CASE ...........................................................6

      A.    The Underlying Lawsuit ................................................6

      B.    The District Court's Dismissal of This Action ........................9

SUMMARY OF ARGUMENT ........................................................11

ARGUMENT ................................................................................11

  I.    Standard of Review .......................................................11

  II.    California Law Applies to this Dispute............................12

      A.    There Is No Conflict Between California and Nevada Law................................................................13

           1.    Both states recognize insurers' liability in excess of limits for a violation of the duty of good faith and fair dealing .............................................13

           2.    Nevada's and California's equitable subrogation laws do not "materially conflict"...................................15

      B.    California's Choice of Law Rules Require Application of California Law to This Dispute................................18

           1.    California law applies under the governmental interest test .......................................................19

                a.    There is no "material conflict" between California and Nevada law ...............................20

                b.    Nevada does not have a "strong interest" in having its law applied to this dispute .................20

                c.    California's interests would be "more significantly impaired" if the Court were to apply Nevada law ...............................26

            2.    California law applies under Civil Code § 1646 ..........28

  III.    Under California Law, North River's Suit Is Not Barred as a Matter of Law .......................................................30

IV.   Under Nevada Law, North River's Suit Is Not Barred as a
      Matter of Law ................................................................................ 31

      A.   *St. Paul* and *Aspen* Are Inapplicable to North River's
           Suit ................................................................................ 32

           1.   *St. Paul* is inapposite and *Aspen* lacks any
                precedential or persuasive value .................................... 33

           2.   Unlike the plaintiff in *St. Paul*, North River
                involuntarily paid the insured's loss .............................. 36

      B.   Subrogation Is an Equitable Remedy Not Subject to
           Bright-Line Rules .......................................................... 38

      C.   The Nevada Supreme Court Would Not Adopt *St. Paul*'s
           Flawed Holdings .......................................................... 41

           1.   The *St. Paul* court misinterpreted authorities
                holding damages must exceed policy limits ................. 41

           2.   The *St. Paul* court ignored binding Nevada law on
                equitable subrogation .................................................... 43

           3.   The rule in *St. Paul* creates incentives that harms
                insureds ...................................................................... 46

      D.   Nevada Would Likely Follow California and the
           Majority of States in Recognizing Equitable Subrogation
           Between Insurers ........................................................ 47

CONCLUSION .................................................................................... 49

STATEMENT OF RELATED CASES ................................................ 50

CERTIFICATE OF COMPLIANCE ................................................... 51

CERTIFICATE OF SERVICE ............................................................. 52

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ace Am. Ins. Co. v. Fireman's Fund Ins. Co.*,
2 Cal. App. 5th 159 (2016) ..........................................................31, 42, 43, 47

*Aetna Life & Cas. Co. v. Ford Motor Co.*,
50 Cal. App. 3d 49 (1975) ..............................................................................36

*Allstate Ins. Co. v. Miller*,
125 Nev. 300 (2009) ........................................................................13, 14, 45

*Am. Sterling Bank v. Johnny Mgmt. LV, Inc.*,
126 Nev. 423 (2010) ........................................................................16, 38

*Ameron Int'l Corp. v. Am. Home Assur. Co.*,
2011 WL 2261195 (C.D. Cal. June 6, 2011) ................................................29

*Arguello v. Sunset Station, Inc.*,
127 Nev. 365 (2011) ........................................................................15, 43

*Arno v. Club Med*,
22 F.3d 1464 (9th Cir. 1994) ..........................................................................29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................12

*Aspen Specialty Ins. Co. v. Eighth Judicial Dist. Court of Nev.*,
2023 WL 3185274 (Nev., Apr. 28, 2023) ..................................................4, 35

*AT&T Techs., Inc. v. Reid*,
109 Nev. 592 (1993) ........................................................................15, 26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................12

*Benavidez v. Cnty. of San Diego*,
993 F.3d 1134 (9th Cir. 2021) ..........................................................11, 12, 31

*Caito v. United Cal. Bank*,
20 Cal. 3d 694 (1978) ......................................................................................17

*Cal. Cas. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*,
185 Ariz. 165 (Ct. App. 1996), *corrected* (Feb. 28, 1996)..............................48

*Century Sur. Co. v. Andrew*,
134 Nev. 819 (2018) ........................................................................................44

*Commercial Union Ass. Cos. v. Safeway Stores*,
26 Cal. 3d 912 (1980) ......................................................................................14

*Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*,
472 F. Supp. 2d 1183 (S.D. Cal. 2007) ..........................................................20

*Cousins v. Lockyer*,
568 F.3d 1063 (9th Cir. 2009) ........................................................................10

*Cromer v. Bristol W. Ins. Grp.*,
131 Nev. 1268 (2015) ......................................................................................14

*Del Real v. U.S. Fire Ins. Crum & Forster*,
  64 F. Supp. 2d 958 (E.D. Cal. 1998), *aff'd sub nom. Del Real v.
  U.S. Fire Ins. Co.*, 188 F.3d 512 (9th Cir. 1999) ................................. 25

*Egan v. Mut. of Omaha Ins. Co.*,
  24 Cal. 3d 809 (1979) ...................................................................... 21

*Emp'rs Ins. of Wausau v. Granite St. Ins. Co.*,
  330 F.3d 1214 (9th Cir. 2003) ......................................................... 32

*Emp'rs Mut. Liab. Ins. Co. v. Tutor-Saliba Corp.*,
  17 Cal. 4th 632 (1998) .................................................................... 16

*Engineered Floors, LLC v. Lakeshore Equip. Co.*,
  2023 WL 3149265 (C.D. Cal. Mar. 3, 2023), *reconsideration
  denied*, 2023 WL 4203512 (C.D. Cal. May 18, 2023) ...................... 30

*Erie Railroad Co. v. Tompkins*,
  304 U.S. 64 (1938) .......................................................................... 12

*Frontier Oil Corp. v. RLI Ins. Co.*,
  153 Cal. App. 4th 1436 (2007) ................................................... 19, 28

*Genesis Ins. Co. v. Magma Design Automation, Inc.*,
  2015 WL 5123424 (N.D. Cal. Aug. 31, 2015), *aff'd*, 705 F. App'x
  505 (9th Cir. 2017) .......................................................................... 36

*Giles v. GMAC*,
  494 F.3d 865 (9th Cir. 2007) ....................................................... 12, 32

*Hamilton v. Md. Cas. Co.*,
  27 Cal. 4th 718 (2002) .................................................................... 14

*Han v. United States*,
  944 F.2d 526 (9th Cir. 1991) ........................................................... 17

*Home Haven, Inc. v. United States*,
  17 F. App'x 512 (9th Cir. 2001) ...................................................... 17

*Hurtado v. Superior Ct.*,
  11 Cal. 3d 574 (1974) ..................................................................... 20

*In re Fontainebleau Las Vegas Holdings*,
  128 Nev. 556 (Nev. 2012) ............................................................... 17

*Klaxon Co. v. Stentor Elec. Manufacturing Co., Inc.*,
  313 U.S. 487 (1941) ........................................................................ 18

*Laffranchini v. Clark*,
  39 Nev. 48 (1915) ................................................................. 16, 36, 38

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) ......................................................... 12

*Medina v. Harco Nat'l Ins. Co.*,
  2016 WL 7647680 (N.D. Cal. July 29, 2016) ............................ 23, 24, 25

*Memphis & L. R. R. Co. v. Dow*,
  120 U.S. 287 (1887) ........................................................................ 38

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Millers Cas. Ins. Co., of Texas v. Briggs*,
    100 Wash. 2d 9 (1983) .................................................................48

*Mort v. United States*,
    86 F.3d 890 (9th Cir. 1996) .....................................................17, 27

*Nat'l Sur. Corp. v. Hartford Cas. Ins. Co.*,
    493 F.3d 752 (6th Cir. 2007) .....................................................48

*Nat'l Sur. Corp. v. Public Serv. Mut. Ins. Co.*,
    2008 U.S. Dist. LEXIS 130955 .................................................36

*Patent Scaffolding Co. v. William Simpson Const. Co.*,
    256 Cal. App. 2d 506 (1967) ....................................................18

*Patton v. Cox*,
    276 F.3d 493 (9th Cir. 2002) ....................................................18

*Prieto v. Paul Revere Life Ins. Co.*,
    354 F.3d 1005 (9th Cir. 2004) ..................................................12

*Richardson v. Emp'rs Liab. Assur. Corp.*,
    25 Cal. App. 3d 232 (1972) ......................................................26

*Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co.*,
    103 Cal. App. 3d 198 (1980) ................................................23, 28

*Safeco Ins. Co. of Am. v. Super. Court of Contra Costa Cnty.*,
    71 Cal. App. 4th 782 (1999) .....................................................42

*School Dist. No. 1, Multnomah Cnty. v. Mission Ins. Co.*,
    58 Or. App. 692 (1982) ............................................................48

*St. Paul Fire & Marine Ins. Co. v. Aspen Specialty Ins. Co.*,
    2019 WL 13257683 (Nev. Dist. Ct., Oct. 15, 2019) .................34

*St. Paul Fire & Marine Ins. Co. v. Aspen Specialty Ins. Co.*,
    2020 WL 13616460 (Nev. Dist. Ct., Oct. 9, 2020) ...................35

*St. Paul Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*,
    Hawai'i 449 (2015) ...................................................................48

*St. Paul Fire & Marine Ins. Co. v. Nat'l Union Fire Ins. Co.*,
    2022 WL 17543613 (Nev., Dec. 8, 2022) .......................... passim

*State Farm Gen. Ins. Co. v. Wells Fargo Bank, N.A.*,
    143 Cal. App. 4th 1098 (2006) .................................................27

*Stonewall Surplus Lines Ins. Co. v. Johnson Controls*,
    14 Cal. App. 4th 637 (1993) .........................................21, 22, 23, 24

*Strassberg v. New England Mut. Life Ins. Co.*,
    575 F.2d 1262 (9th Cir. 1978) ..............................................20, 21

*Stromberg v. Qualcomm Inc.*,
    14 F.4th 1059 (9th Cir. 2021) ...................................................12

*Travelers Cas. & Sur. Co. v. Am. Equity Ins. Co.*,
    93 Cal. App. 4th 1142 (2001) ...................................................48

*Turner v. City & Cnty. of San Francisco*,
   788 F.3d 1206 (9th Cir. 2015) ......................................................... 10

*U.S. Bank, N.A. v. White Horse Ests. Homeowners Ass'n,*
   987 F.3d 858 (9th Cir. 2021) ............................................................ 32

*United States Fid. & Guar. Co. v. Peterson,*
   91 Nev. 617 (1975) ............................................................................ 14

*Valley Power Co. v. Toiyabe Supply Co.*,
   80 Nev. 458 (1964) ..................................................................... 43, 44

*Wash. Mut. Bank, FA v. Superior Court,*
   24 Cal. 4th 906 (2001) .......................................................... passim

*Wilson v. 21st Century Ins. Co.*,
   42 Cal. 4th 713 (2007) ...................................................................... 13

## STATUTES

Cal. Civ. Code § 1646 ........................................................................ 28, 29

NRS 686A.310(1)(e) ................................................................................ 14

## OTHER AUTHORITIES

Litig. & Prev. Ins. Bad Faith § 7:9 ........................................................ 48

Restatement of Liability Insurance § 24 (2019) ....................... 14, 15, 41

# PRELIMINARY STATEMENT

This is a dispute between an excess insurer (Appellant The North River Insurance Company ("North River")) and a primary insurer (Appellee James River Insurance Company ("James River")) about the latter's unreasonable failure to settle a claim against the parties' insured for an amount within its $1 million policy limits, subjecting the insured to a settlement demand *five times* those limits. Fortunately for the insured, North River stepped in when James River refused to pay anything more than its policy limits, and protected the insured from an even worse potential judgment at trial. North River now seeks to recover its payment from the wrongdoer, James River.

James River, as the primary insurer, agreed to defend the parties' insured against claims for negligence and wrongful death. During that litigation, James River had ample opportunity to fulfill its obligation to reasonably settle the claim within the $1 million limits of James River's insurance policy. Over the course of two and a half years, the underlying plaintiff made three settlement demands on James River for an amount at or below the $1 million primary policy limits. Despite a factual record that put James River on notice that there was a substantial likelihood of an adverse verdict and a judgment in excess of $1 million, James River refused to effectuate a prompt, fair, and equitable settlement. Having lost patience with James River, the claimants increased their demand to $5 million.

That new demand implicated North River's $10 million excess policy. James River's failure to protect the insured was now subjecting both insurers to potential liability for failure to settle. After James River belatedly agreed to contribute its full limits of $1 million, North River then paid the $4 million balance under a full reservation of rights. To protect its own interests and those of its insured, North River involuntarily funded the settlement and reserved the right to seek reimbursement of its payment.

North River thus brought this action to recoup its $4 million payment from James River, which chose to gamble with North River's policy limits rather than settle the claim within its own policy limits when it had the chance. On those grounds, North River asserted a cause of action against James River in the Central District of California (the "District Court") for breach of the implied covenant of good faith and fair dealing—a claim the insured could have brought itself had North River not responded appropriately and paid $4 million to the underlying claimants on the insured's behalf. Because the claim belonged to the insured but for North River's payment, North River brings its action through the doctrine of equitable subrogation.

Two bedrock insurance principles anchor an excess insurer's equitable subrogation claim against a primary insurer. First, as part of its duty of good faith and fair dealing, a primary insurer defending its insured has a duty to accept a

reasonable settlement demand within its limits. If the primary insurer unreasonably refuses to settle and the insured suffers an excess judgment, the insured has a "bad faith" claim against the primary insurer for the full amount of the settlement or judgment, regardless of policy limits.

Second, generally, an insurer that compensates its insured for loss caused by a third-party wrongdoer or tortfeasor can "stand in the shoes" of the insured and pursue the insured's claims against that third party through the equitable doctrine of subrogation. A common example is when an insurer compensates its insured for injuries incurred in an automobile accident and then pursues the claim the insured would have had against the tortfeasor driver. As a result of these equitable subrogation laws, a majority of states across the country recognize that an excess insurer who compensates the insured for its losses resulting from a primary insurer's bad faith refusal to settle has a claim against that primary insurer.

The District Court's dismissal with prejudice of North River's complaint— on a motion to dismiss and without oral argument—resulted from two critical errors. First, the District Court incorrectly held that Nevada law, rather than California law, applied to North River's claim. There is no conflict between the state's laws, and the District Court should have applied California law. In any event, under either of California's choice of law rules, California law governs because (i) Nevada has no interest in having its laws applied to this dispute

between a California insured—into whose shoes North River steps—and its Arizona insurer and (ii) James River's policy was issued to a California corporation with a California "Service of Suit" provision. There is no dispute that if California law applies, North River's claim is not barred as a matter of law because California recognizes equitable subrogation between insurers even if the ultimate loss is within the insured's collective policy limits.

Second, in predicting how the Nevada Supreme Court would rule on James River's motion to dismiss, the District Court misapplied a single unpublished decision of a divided and shorthanded Nevada Supreme Court. In that nonbinding decision, *St. Paul Fire & Marine Ins. Co. v. Nat'l Union Fire Ins. Co.,* 2022 WL 17543613 (Nev., Dec. 8, 2022) ("*St. Paul*"), the Nevada Supreme Court—deciding a motion for summary judgment—denied an excess insurer's subrogation claim against a same-level excess insurer because all four settling insurers made the collective decision to settle the underlying claim for an amount that exhausted but did not exceed their policy limits. A three-justice panel then applied the holding in *St. Paul* to bar the excess insurer's subrogation claim against the primary insurer in *Aspen Specialty Ins. Co. v. Eighth Judicial Dist. Court of Nev*., 2023 WL 3185274 (Nev., Apr. 28, 2023) ("*Aspen*").

There is no basis to conclude that the current Nevada Supreme Court, if all seven Justices were seated and had occasion to consider the precise facts here,

would bar North River's equitable subrogation claim against James River as a matter of law. Critically, at this motion-to-dismiss stage, all of North River's allegations must be taken as true, including its allegation that it did not act as a volunteer by funding the settlement under a full reservation of rights. Further, by deciding North River's claim is barred as a matter of law because the settlement amount did not exceed the insured's collective policy limits, the District Court effectively decided that Nevada would not recognize equitable subrogation between insurers in any circumstance. That ruling does not find support anywhere in Nevada law, including *St. Paul* and *Aspen*. Indeed, such a rule would deviate from the majority of states including California, to which Nevada courts look for guidance on novel issues of law, and it would disincentivize excess insurers from stepping into the fray to protect their insureds from another carrier's bad faith.

The Court should overturn the District Court's order granting James River's motion to dismiss.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction pursuant to 28 U.S. Code §1332, because the amount in controversy exceeds $75,000.00 exclusive of interest and costs, and because complete diversity exists between Appellant and Appellee. This Court has jurisdiction to review the District Court's dismissal of this action under 28 U.S.C. § 1291. The District Court dismissed Appellant's complaint

without leave to amend on August 4, 2023. (ER-3–12) (the "Order"). Appellant filed its timely Notice of Appeal on August 31, 2023.

## ISSUES PRESENTED

1. Did the District Court err in determining that Nevada law, rather than California law, applies to this dispute?

2. If Nevada law applies, did the District Court err in holding that Appellant's claim for equitable subrogation fails as a matter of law?

## STATEMENT OF THE CASE

### A. The Underlying Lawsuit[1]

On May 25, 2017, Marcus Collins was fatally shot in unit G-312 of the Shelter Island Apartments ("Shelter Island") in Las Vegas, Nevada. (ER-92 ¶ 5.)

Shelter Island was an insured location under the $1 million Commercial General Liability insurance policy that James River issued to L.A. Pacific Center Inc., in Monrovia, California, for the period of March 1, 2017, to March 1, 2018, and that identified Alhambra Place Partnership, LP dba Shelter Island Apartments as an additional named insured. (*Id*. ¶ 7.) Shelter Island was likewise an insured location under the $10 million excess insurance policy that North River issued to L.A. Pacific Center Inc., in Monrovia, California, for the same period, and that also

---

[1] The facts presented here were pleaded by Appellant in the District Court action, and the District Court was therefore required to accept them as true.

identified Alhambra Place Partnership, LP dba Shelter Island Apartments as an additional named insured.  (*Id*. ¶ 10.)

On March 7, 2019, the decedent's estate filed suit in Nevada state court against Shelter Island, alleging negligence and wrongful death (the "Underlying Action").  (*Id*. ¶ 6.)  The complaint alleged that Shelter Island "negligently failed to control, supervise and maintain the premises," citing security cameras that did not work or adequately record the grounds and "little, no and/or ineffective security patrols."  (ER-104 ¶¶ 15–16.)  It alleged that Shelter Island's "conscious disregard for the criminal activity" on the premises created the circumstances that ultimately cost the decedent his life.  (ER-105 ¶ 24.)   After receiving notice of the claim, James River agreed to defend Shelter Island in the Underlying Action and retained counsel to provide the defense.  (ER-104 ¶¶ 12–13.)  James River handled the claim from Virginia.  (ER-16.)

On March 28, 2019, the plaintiff in the Underlying Action issued a settlement demand to Shelter Island for James River's policy limits of $1 million.  (ER-95 ¶ 21.)  More than two years went by, and still James River failed to resolve the matter for the insured.  During that period, James River learned more about Shelter Island's troubled history.  On October 18, 2019, James River was provided a Notice and Declaration of Chronic Nuisance that the Las Vegas Metropolitan Police Department had issued to the Shelter Island Apartments on March 9, 2017,

two days after the plaintiff filed the Underlying Action. (ER-94 ¶ 14.) The notice was based on the number of calls for service to address violence at the property and other disturbance calls from December 2016 through February 2017. (*Id*.)

In or about May 2021, the plaintiff in the Underlying Action issued an offer of judgment for $990,000. (ER-95 ¶ 22.) James River did not accept it. On November 3, 2021, the plaintiff reduced its settlement demand to $975,000. (*Id*. ¶ 24.) Again, James River did not accept it. James River's refusal to affect a settlement was unreasonable given that James River's own defense counsel on or about that same date—and again in February and July 2022—valued the case at over $1 million. (ER-96 ¶ 25.)

On or about August 30, 2022, the plaintiff in the Underlying Action increased its settlement demand to $5 million. (*Id*. ¶ 28.) The case ultimately settled for this amount on November 30, 2022. (*Id*. ¶ 30.) James River contributed the $1 million available under the primary policy limits. (ER-97 ¶ 32.) To protect its insured and subject to a full reservation of rights, including but not limited to its right to reimbursement, North River funded the $4 million balance of the settlement. (*Id*. ¶ 33.) In doing so, North River was not acting as a volunteer. (*Id*. ¶ 34.) North River did so under the belief that it could face bad faith claims from the insured by failing to settle.

**B.    The District Court's Dismissal of This Action**

On January 4, 2023, North River filed this action seeking to recover its $4 million settlement payment under the doctrine of equitable subrogation.  (ER-91–99) (the "Complaint").  The Complaint alleged that James River "knew that there was a substantial likelihood of an adverse verdict and a judgment in excess of [James River's] primary policy limit, including an award of punitive damages," and asserted that "there was no reasonable basis not to accept [the plaintiff's] demands within its policy limit."  (ER-96 ¶ 27.)  Appellant also alleged that "in order to protect [the insured] and pursuant to a complete reservation of its rights under [North River's] excess policy and the law, including, but not limited to, its right to reimbursement, [North River] agreed to fund the balance of the settlement of the Underlying Lawsuit."  (ER-97 ¶ 33.)  Consistent with the principles of equitable subrogation, North River explicitly alleged that "it was not acting as a volunteer in contributing to the settlement" of the Underlying Action.  (*Id*. ¶ 34.)

James River moved to dismiss on the grounds that Nevada does not recognize equitable subrogation between insurers where the ultimate judgment did not exceed all of the insured's available insurance.  (*See* ER-5.)  On August 4, 2023, the District Court granted James River's motion, dismissing the Complaint without leave to amend.  (ER-12.)  The District Court based its Order on *St. Paul*, an unpublished decision the Nevada Supreme Court issued in December 2022 that

departed from a fundamental tenet of equitable subrogation. (ER-10–11) (citing *St. Paul*). The nonbinding decision found that the insured nightclub-hotel suffered no damages because its insurers collectively funded the settlement up to their respective policy limits, leaving the insured without a claim to subrogate. (*Id.*) The District Court concluded: "It follows that here, since [North River] has not shown that the $5 million settlement amount exceeded the $11 million combined policy limits, [North River] has not shown that Shelter Island suffered damages to state an equitable subrogation claim." (ER-12.)

The District Court also relied on James River's recitation of facts in its motion, which introduced disputes outside the four corners of the Complaint. The District Court, for instance, cited James River's assertion that "[North River] and Shelter Island agreed with the decisions not to settle," and that when James River purportedly decided to make a $1 million settlement offer, "[North River] told [James River] not to make such an offer, fearing that it would lead to negotiations and a settlement requiring [North River] to pay out its excess policy coverage." (ER-4.) The Complaint does not allege such facts. As the District Court itself observed, it was required at the motion-to-dismiss stage to accept all pleaded facts as true and construe them in the light most favorable to Appellant. (ER-5) (citing *Turner v. City & Cnty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009)).

## SUMMARY OF ARGUMENT

The District Court's order dismissing North River's Complaint based on its conclusion that, under Nevada law, there can be no equitable subrogation between insurers where they settled the claim against their insured within their collective policy limits must be overturned for two primary, alternative reasons. First, California law applies to this dispute and California indisputably recognizes equitable subrogation between an excess and primary insurer even where the loss only exceeds the primary insurer's limits. Second, even if the Court were to apply Nevada law, North River's claim is not barred at the motion-to-dismiss stage because it alleged it did not act as a volunteer by contributing to the underlying settlement under a reservation-of-rights and the unpublished Nevada Supreme Court decisions relied upon by the District Court do not accurately reflect binding Nevada law.

## ARGUMENT[2]

### I.  STANDARD OF REVIEW

The District Court's dismissal for failure to state a claim pursuant to Rule 12(b)(6) is reviewed de novo. *See, e.g., Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021). The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the

---

[2]  Unless otherwise noted, this brief omits internal quotation marks and original alterations and adds any emphasis reflected in quoted passages.

nonmoving party." *Id.* (citing *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The District Court's decision on the appropriate choice of law is also reviewed de novo. *See, e.g., Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1066 (9th Cir. 2021). Underlying factual determinations are reviewed for clear error. *See id.* at 1059. The district court's application of state substantive law in diversity actions is reviewed de novo. *Giles v. GMAC*, 494 F.3d 865, 872 (9th Cir. 2007); *Prieto v. Paul Revere Life Ins. Co.*, 354 F.3d 1005, 1010 (9th Cir. 2004).

## II. CALIFORNIA LAW APPLIES TO THIS DISPUTE

A district court sitting in diversity presumptively applies the laws of the forum state. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938). A court only conducts a choice of law analysis if a party invokes the law of a foreign state and demonstrates a conflict between the state's laws. James River contends that Nevada law applies but fails to demonstrate any conflict between California's and Nevada's equitable subrogation law. Thus, California law applies. Even if the

Court conducts a choice of law analysis, California law governs because James River's policy was issued to a California insured and contemplated performance in California, and California has the greater interest in having its laws applied to this dispute to protect a resident insured.

## A. There Is No Conflict Between California and Nevada Law

"A choice-of-law analysis is only necessary where there is a material conflict in the laws of the two states." (ER-6) (citing *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 919–20 (2001) ("The fact that two or more states are involved does not in itself indicate there is a conflict of laws problem . . . if the relevant laws of each state are identical, there is no problem[.]")). Here, there is no problem. There is no conflict between California and Nevada binding authority, which the Court must follow if Nevada law applied.

### 1. Both states recognize insurers' liability in excess of limits for a violation of the duty of good faith and fair dealing

An essential element of an equitable subrogation claim is that there be a loss to which a third party can subrogate. Here, there is no difference between California and Nevada law because both states hold defending insurers liable for excess judgments if they violate the duty to act reasonably in settlement.

There is a covenant of good faith and fair dealing implicit in every contract, including insurance policies. *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 751 (2007); *Allstate Ins. Co. v. Miller*, 125 Nev. 300, 308 (2009) ("*Miller*"); *see also*

*United States Fid. & Guar. Co. v. Peterson,* 91 Nev. 617, 620 (1975) (Nevada looked to California law when it established the implied covenant of good faith and fair dealing in the insurance context). For insurers, this includes a duty to accept reasonable settlement demands within policy limits. *Hamilton v. Md. Cas. Co.*, 27 Cal. 4th 718, 724 (2002); *see Miller*, 125 Nev. at 311 (explicitly purporting to expand bad faith liability beyond solely circumstances in which an insurer rejects a settlement offer within the policy limits); *cf. Cromer v. Bristol W. Ins. Grp.*, 131 Nev. 1268 (2015) ("An insurer must settle claims promptly, fairly, and equitably once its liability becomes reasonably clear.") (citing NRS 686A.310(1)(e)). Both states recognize that an insurer who violates this duty is liable for the judgment against the insured excess of the policy limits. *Commercial Union Ass. Cos. v. Safeway Stores*, 26 Cal. 3d 912, 916–17 (1980); *see Miller*, 125 Nev. at 314 (an insurer's breach of the duty to settle subjects it to "all compensatory damages proximately caused by its breach," which may exceed the policy limits); *cf. Cromer*, 131 Nev. at *1 (insurer is "not liable for an excess judgment for failing to settle the claim" if there was "no opportunity to settle within policy limits").

This rule protects insureds from insurers' self-interested behavior. "[W]hen the insured faces a potential judgment in excess of the policy limit (an 'excess judgment'), the insurer may have an incentive to undervalue the possibility of a loss at trial, because . . . as long as the insurer's liability is bounded by the policy

limit, taking the case to trial imposes no added risk on the insurer . . ." Restatement of Liability Insurance § 24 cmt. b (2019). In such a case, the insurer is "essentially gambling with the insured's money, or gambling with the excess insurer's money, because the insured or the insured's excess insurer will have to pay any verdict in excess of the policy limit." *Id.* Giving the defending insurer a duty to make reasonable settlement decisions aligns the interests of insurer and insured, and "creates an incentive for insurers to take into account this risk to insureds and excess insurers." *Id.* Both Nevada and California share an interest in protecting insureds from bad faith behavior by insurers.

### 2. Nevada's and California's equitable subrogation laws do not "materially conflict"

Under Nevada law, subrogation "is an equitable doctrine created to accomplish what is just and fair as between the parties." *AT&T Techs., Inc. v. Reid*, 109 Nev. 592, 595 (1993) (quotation omitted). It applies when one party, the subrogee [e.g., the excess insurer], involuntarily pays the obligation or loss of another, the subrogor [e.g., the insured], for which a third party, wrongdoer, or otherwise [e.g., the primary insurer], is eventually found to bear responsibility. *See id.* at 595–96 (1993). Subrogation creates derivative rights and requires an underlying independent basis upon which the subrogor could have recovered the payment as if the subrogee had never stepped in to assume the loss. *See Arguello v. Sunset Station, Inc.*, 127 Nev. 365, 368 (2011). That subrogee cannot have acted

as a volunteer.  *Laffranchini v. Clark*, 39 Nev. 48, 55 (1915).  A volunteer is "one who thrusts himself into a situation on his own initiative, and not one who becomes a party to a transaction upon the urgent petition of a person who is vitally interested, and whose rights would be sacrificed did he not respond to the importunate appeal."  *Id.*  As an equitable doctrine, the application of subrogation depends upon the individual facts and circumstances presented by each particular case, "and generally, where it is equitable that a person furnishing money to pay a debt should be substituted for the creditor, or in place of the creditor, such person will be so substituted."  *Id.* at 56-57; *see also Am. Sterling Bank v. Johnny Mgmt. LV, Inc.*, 126 Nev. 423, 428 (2010) (en banc) (subrogation is an "equitable remedy that requires the court to balance the equities based on the facts and circumstances of each particular case.").

Under California law, as with Nevada law, "[a] party who has been required to satisfy a loss created by another's wrongful act is equitably entitled to 'step into the shoes' of the injured party and pursue recovery from the wrongdoer."  *Emp'rs Mut. Liab. Ins. Co. v. Tutor-Saliba Corp.*, 17 Cal. 4th 632, 639 (1998).  "Equitable subrogation is generally appropriate where (1) the subrogee made the payment to protect his or her own interest, (2) the subrogee did not act as a volunteer, (3) the subrogee was not primarily liable for the debt paid, (4) the subrogee paid off the entire encumbrance, and (5) subrogation would not work any injustice to the rights

of the junior lienholder." *Han v. United States*, 944 F.2d 526, 529 (9th Cir. 1991) (applying California law). Equitable subrogation is a broad equitable remedy, and therefore it applies not only when these five factors are met, but also "whenever one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." *Id.* (quoting *Caito v. United Cal. Bank*, 20 Cal. 3d 694, 704 (1978)). All of the equitable subrogation rules established in binding Nevada law are encompassed within California equitable subrogation law. Thus, California matches Nevada law on equitable subrogation in all material respects.

The Nevada Supreme Court has "recognized the doctrine of equitable subrogation in a variety of situations." *In re Fontainebleau Las Vegas Holdings*, 128 Nev. 556, 578 n.8 (Nev. 2012) (en banc) (collecting cases). However, as the District Court noted, the Nevada Supreme Court "has not published a decision addressing whether it would recognize equitable subrogation in the context of two insurance companies and, if so, what an insurer claiming subrogation would have to prove." (ER-9.) In fact, "[t]here is limited Nevada authority on the doctrine of equitable subrogation," and the Nevada courts look to "the law of other jurisdictions, particularly California, for guidance." *Mort v. United States*, 86 F.3d 890, 893 (9th Cir. 1996) (analyzing California law to apply Nevada law); *Home Haven, Inc. v. United States*, 17 F. App'x 512, 513 (9th Cir. 2001). Thus, to the

extent there are differences between the state's laws because Nevada's is *lacking*, Nevada courts look to California law in any event and no conflict would arise. California has well-developed law on the standards for equitable subrogation between insurers. *See Patent Scaffolding Co. v. William Simpson Const. Co.*, 256 Cal. App. 2d 506, 509 (1967) (listing elements of an insurer's equitable subrogation cause of action and collecting California cases). The unpublished decision in *St. Paul* does not change this analysis for all the reasons explained below. *See infra __*.

Without a "material conflict" between Nevada and California equitable subrogation law, the Court need not conduct a choice of law analysis and should apply California law to this dispute.

### B.    California's Choice of Law Rules Require Application of California Law to This Dispute

Even if the Court decides to conduct a choice of law analysis, California law governs. A Federal Court in a diversity case will apply the same choice of law rules that the local State Court would apply. *Klaxon Co. v. Stentor Elec. Manufacturing Co., Inc*., 313 U.S. 487, 496 (1941); *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). Thus, this Court applies California's choice of law rules.

In insurance disputes, California employs two different choice of law rules depending upon the issue presented: (i) Civil Code Section 1646, or (ii) California's governmental interest test. Civil Code Section 1646 determines the

law governing the *interpretation* of an insurance policy. *See Frontier Oil Corp. v. RLI Ins. Co*., 153 Cal. App. 4th 1436, 1461 (2007). California's governmental interest test governs all other choice of law issues that arise under insurance policies. *See id.* (e.g., "the right to recover attorney fees in an action to enforce the insured's rights under the policy" and "right of indemnity for punitive damages," which do not involve policy interpretation).

The District Court acknowledged that Section 1646 only governs the interpretation of the insurance policy, but then erroneously applied Section 1646's choice of law rule to this dispute. (ER-6.) This Court should apply California's governmental interest test because the Court is not tasked with interpreting James River's policy; it is determining whether North River can stand in the shoes of a California insured to assert the insured's claims against the primary insurer, James River. Regardless of which test the Court employs, the result is the same: California law governs.

### 1. California law applies under the governmental interest test

California's governmental interest test requires a showing that (1) there is a material conflict between the laws of California and another interested state; (2) the other state has a legitimate interest in having its law apply to this dispute; and (3) the other state's interests will be more significantly impaired than California's. *Washington Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 919–20 (2001).

"[A] separate conflict of laws inquiry must be made with respect to each issue in the case." *Id*. at 920.

### a.　There is no "material conflict" between California and Nevada law

"A state's law is materially different from California law if application of the other state's law leads to a different result." *Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*, 472 F. Supp. 2d 1183, 1200 (S.D. Cal. 2007). As the party seeking to invoke Nevada law, Appellee bears the burden of establishing that California and Nevada law are "materially different." *Wash. Mut. Bank*, 24 Cal. 4th at 919.

As explained above, there is no "material conflict" between the laws of California and Nevada. *Supra* 13–18. This alone requires the Court to apply California law under this test.

### b.　Nevada does not have a "strong interest" in having its law applied to this dispute

Even if the laws hypothetically could be characterized as materially different, there would be "still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied." *Hurtado v. Superior Ct*., 11 Cal. 3d 574, 580 (1974); *see also Wash. Mut. Bank*, 24 Cal. 4th at 920. But simply showing that two states have some general interest in the dispute is not enough. "Generally, the preference is to apply California law, rather than choose the foreign law as a rule of decision." *Strassberg v. New England Mut. Life Ins. Co*., 575 F.2d 1262, 1264 (9th Cir. 1978). Accordingly, "if application of a

foreign decisional rule will not significantly advance the interests of the foreign state, a California court will conclude that the conflict is 'false' and apply its own law." *Id.* "Only if both California and the foreign state have a strong interest in the application of their own law to the controversy will a true conflict be said to exist," requiring a court to proceed to the final step of the analysis to assess the "comparative impairment" to each states' interest of the choice of one rule over the other. *Id.*; *accord Wash. Mut. Bank*, 24 Cal. 4th at 920.

Application of Nevada law will not significantly advance Nevada's interests in this litigation. A state generally has strong interests in a dispute when its citizens are the injured parties. *See, e.g., Stonewall Surplus Lines Ins. Co. v. Johnson Controls*, 14 Cal. App. 4th 637, 649 (1993) ("California's paramount interest is in protecting its residents by deterring tortfeasors."). The injured Nevada plaintiffs were fully compensated under Nevada law through the settlement of the Underlying Action. Any interest Nevada had in this dispute was extinguished when the underlying plaintiffs were made whole. Nevada has no interest in applying its laws to a collateral bad faith dispute between an excess insurer standing in the shoes of a California insured and that insured's primary insurer. "Bad faith" rules are intended to protect the insured, not the judgment creditors. *See, e.g., Egan v. Mut. of Omaha Ins. Co*., 24 Cal. 3d 809, 818 (1979) (implied covenant of good faith is imposed to ensure that insurer "give[s] at least

as much consideration to the welfare of its insured as it gives to its own interests"). The claims at issue in this dispute are those of the California insured being asserted by its excess insurer, giving California the only state with a "strong interest" in having its laws applied.

The District Court misapplied California caselaw to erroneously conclude that California has *no interest* in this dispute because the Underlying Action occurred in Nevada. (ER-9.) In *Stonewall*, a Wisconsin corporation suffered an adverse verdict of punitive damages after a California resident sustained injuries from the insured's defective automobile battery that was sold in California. 14 Cal. App. 4th at 639. In the insurers' action seeking declarations that they had no duty to indemnify the insured-corporation for punitive damages, the insured alleged that Wisconsin law governed the policies, which would allow it to recover from the insurers. *Id.* The California Court of Appeal found that because the insured and its insurers "carefully considered the complexity of the corporation's activities," the parties should have expected that not only would the corporation's liability to a third party potentially be governed by the state in which the liability arose, but that the corporation's "right to indemnity for such a claim might also be governed by that state's law." *Id.* at 648. The court explicitly distinguished cases where an insured sues its insurer for a breach of the duty to defend. *Id.* at 650 n.9 (discussing *Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co.*, 103

Cal. App. 3d 198, 205–6 (applying the law of California, where the insured resided, rather than Florida, where the underlying action occurred)).  In such cases, the state where the claim arose has "no interest in deterring the insurer's wrongful conduct."  *Id.*  In *Stonewall*, California law applied because it "will have a direct impact on a tortfeasor whose activities within this state harmed a California resident," by "altering the future behavior of a defendant by compelling payment directly from the defendant rather than its insurers."  *Id.*

The District Court similarly misapplied the analysis in the unpublished Central District of California decision in *Medina v. Harco National Insurance Co*. In *Medina*, two Kansas insureds suffered a $3.5 million judgment that exceeded their $1 million insurance policy limit for California plaintiffs' automobile accident injuries after the out-of-state insurer failed to settle the action within its limits when it had the opportunity before trial.  2016 WL 7647680 at *1 (N.D. Cal. July 29, 2016).  The insureds assigned their rights in any action against the insurer to the plaintiffs.  *Id*.  After an unsuccessful appeal, the insureds paid the policy limits to the underlying plaintiffs, who subsequently sued the insurer for breach of contract and violation of the duty of good faith and fair dealing.  *Id*. at *4.  The California plaintiffs sued the insurer under assignment because they were not fully compensated for the judgment rendered against the insureds.  The district court

found that California thus had a greater interest in the dispute than Kansas and applied California law. *Id.* at *9.

*Medina* and *Stonewall* both support the application of California law to this dispute. Where a state's residents were injured and not yet fully compensated for their injuries that state still has a legitimate interest in having its law applied to the dispute. Here, as discussed above, the Nevada plaintiffs were fully compensated when North River and James River funded the final settlement. *Supra* 21. Thus, unlike California in *Medina*, Nevada has no remaining interest in ensuring its citizens' rights are protected. Whether North River is entitled to equitable subrogation in these circumstances will not affect Shelter Island's behavior in operating in Nevada. Nor does the Underlying Action's location give Nevada an interest in a dispute about nonresident Appellee's wrongful conduct in handling Shelter Island's claim. *See Stonewall*, 14 Cal. App. 4th at 160 n.9. Because only California has an interest in having its laws applied to this dispute, there is no problem applying California law. *Hurtado*, 11 Cal. 3d at 580.

The District Court's reliance on cases utilizing the "multiple risk approach" to find that Nevada has an interest in this dispute is misplaced. (ER 8–9.) California courts apply the "multiple risk approach" to determine the location of insured risks in contractual disputes about coverage under the insurance policy terms. *See Stonewall*, 14 Cal. App. 4th at 646 (finding the "multiple risk

approach" applies in disputes about validity of and rights created under an insurance policy); *Del Real v. U.S. Fire Ins. Crum & Forster*, 64 F. Supp. 2d 958, 961 (E.D. Cal. 1998), *aff'd sub nom. Del Real v. U.S. Fire Ins. Co*., 188 F.3d 512 (9th Cir. 1999) (using the "multiple risk approach" only when deciding whether California law applied to the *interpretation* of the policy, and not when performing the governmental interest test); *accord Medina*, 2016 WL 7647680 at *8 (applying the "multiple risk approach" because action for insurer's violation of its duty to settle was "effectively a contract dispute").[3]

This is not a dispute about whether a loss is covered under the terms of an insurance contract. The subject of this dispute is the California insured's bad faith claim against its primary insurer. The reasons for applying the "multiple risk approach" when deciding the relevant contacts for disputes arising under the terms of an insurance policy are irrelevant here. When a dispute arises about whether an insurance policy, by its terms, covers a loss, the most relevant contact to determine the applicable state's laws is the place of the insured risk under that contract. Equitable subrogation does not arise under, nor even require, a contractual

_____

[3] Here, the district court's analysis in *Medina* is questionable. "The duty violated—that of dealing fairly and in good faith with the other party to a contract of insurance—is a duty imposed by law, not one arising from the terms of the contract itself." *Richardson v. Emp'rs Liab. Assur. Corp*., 25 Cal. App. 3d 232, 239 (1972). Because a bad faith action is not "essentially a contract dispute," the court should not have applied the "mutual risk approach" to determine the applicable state law.

- 25 -

relationship. *AT&T Techs.*, 109 Nev. at 595. The underlying injury—violation of the duty of good faith and fair dealing—also does not arise under contract. *Richardson*, 25 Cal. App. 3d at 239. Thus, the Court should not use the "multiple risk approach" or consider the location of insured risks under the insurance policy when deciding which law applies to North River's equitable subrogation claim. In any event, any interest Nevada could have as a location of insured risk is not a "strong interest" for all the reasons discussed above, and the Court need not reach the final step of the "governmental interest test."

### c. California's interests would be "more significantly impaired" if the Court were to apply Nevada law

If the Court were to find that Nevada has a legitimate interest in this litigation, the Court would still need to conduct a "comparative impairment" inquiry, in which it would weigh the interests of each jurisdiction in applying its own respective laws to determine which state's interests would be "more significantly impaired" if the state's law were not applied. *Wash. Mut. Bank*, 24 Cal. 4th at 920. As part of the analysis, the Court "must determine the relative commitment of the respective states to the laws involved and consider the history and current status of the states' laws and the function and purpose of those laws." *Id*.

Even if Nevada were to have any legitimate interest, it would not be "more significantly impaired" if the Court applies California law. As to the history and

status of each states' laws on equitable subrogation claims by excess insurers against primary insurers, only California has published binding decisions in this context. In fact, "[t]here is limited Nevada authority on the doctrine of equitable subrogation" generally, and the Nevada courts look to "the law of other jurisdictions, particularly California, for guidance." *Mort v. United States*, 86 F.3d 890, 893 (9th Cir. 1996). Thus, Nevada's interests would not be impaired if the Court were to apply California law. However, if the Court were to apply Nevada's "limited authority" on equitable subrogation, it would significantly impair California's interests, which are more fully developed.

The function and purpose of bad faith and equitable subrogation laws in California is to protect insureds from primary insurers' harmful conduct by aligning their interests in defending and settling underlying disputes. "Subrogation advances an important policy rationale underlying the tort system by forcing a wrongdoer who helped to cause a loss to bear the burden of reimbursing the insurer for payments made to its insured as a result of the wrongdoer's acts and omissions." *State Farm Gen. Ins. Co. v. Wells Fargo Bank, N.A.*, 143 Cal. App. 4th 1098, 1119 (2006). As discussed above, giving the defending insurer a duty to make reasonable settlement decisions—lest it face liability for the excess judgment—aligns the interests of insurer and insured. *Supra* 14–15. When an excess insurer covers the insured's excess loss in this scenario, allowing that

insurer to equitably subrogate to the insured's claims against the primary carrier further protects insureds by incentivizing excess carriers to step in and pay. Even if Nevada had an interest in deterring wrongful conduct within its borders, it would not necessitate the application of Nevada law because California has the same policy of deterring insurers' wrongful behavior against their insureds. *See Robert McMullan & Son, Inc. v. United States Fid. & Guar. Co*., 103 Cal. App. 3d 198, 206 (1980). Thus, because the "function and purpose" of equitable subrogation law is to protect insureds, the fact that this dispute involves alleged harm to a California insured gives California the greater interest in this dispute.

## 2. California law applies under Civil Code § 1646

To the extent the Court finds that Civil Code Section 1646 applies to this dispute, it would also dictate that California law applies. Section 1646 provides that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Cal. Civ. Code § 1646. The parties' intended place of performance, if not expressly identified, may be gleaned from the nature of the contract. *Frontier Oil Corp*., 153 Cal. App. 4th at 1450.

Here, James River's policy does not state an intended place of performance. However, the policy indicates an intention for performance in California. The

James River policy was issued to a California insured. (ER-16.) The insured's premises are in both Nevada and California (ER-19), but the liability coverage applies to losses in the "coverage territory," defined as all parts of the world (ER-22, ER-34). The policy also has a "California – Service of Suit" provision, which states: "Pursuant to California statutes, this Company designates the following as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance." (ER-89.) This clause demonstrates that the parties to the insurance policy—James River and its California insured—intended that claims under the policy would be brought in California, making it the "place of performance" under California law.

If the Court would be unable to determine a single intended place of performance of the James River policy, under the second clause of Section 1646, the Court would look to the place where the insurance contract was made. Cal. Civ. Code § 1646. An insurance contract is "made" in the state where it is delivered and accepted. *See, e.g., Ameron Int'l Corp. v. Am. Home Assur. Co.*, 2011 WL 2261195, *5 (C.D. Cal. June 6, 2011) (insurance policy was "made" in California under §1646 because it was accepted and delivered there); *Arno v. Club Med*, 22 F.3d 1464, 1468 n.6 (9th Cir. 1994) (same).

The James River policy was "made" in either California or Arizona.  *See* Civ. Code § 1626 ("A contract in writing takes effect upon its delivery to the party in whose favor it is made, or to his agent.").  The James River policy was issued to L.A. Pacific Center, Inc, a California citizen.  It was delivered to L.A. Pacific Center, Inc. or its insurance agent, Burns & Wilcox Brokerage, which is in Arizona. (ER-16.)  The James River policy was *not* "made" in Nevada.  Thus, under Civil Code Section 1646, California law would govern.[4]

## III.   UNDER CALIFORNIA LAW, NORTH RIVER'S SUIT IS NOT BARRED AS A MATTER OF LAW

California law dictates that North River's suit can proceed to discovery. James River moved to dismiss the Complaint solely on the basis that, under Nevada law, Shelter Island suffered no injury to which North River could subrogate because the underlying lawsuit settled with the collective policy limits of the insurers.  (*See* ER-5.)  The District Court granted dismissal solely on that basis as well, denying leave to amend because North River could not allege a loss excess of the policy limits.  (ER-12.)  California law indisputably recognizes equitable subrogation between excess and primary insurers, even where the loss only exceeds the primary insurer's limits.  *See, e.g., Ace Am. Ins. Co. v. Fireman's Fund*

---

[4] To the extent the Court cannot determine the insurance policy's intended place of performance or where it was "made" based upon the pleadings, the Court should employ California's governmental interest test, which also dictates that California law applies.  *See Engineered Floors, LLC v. Lakeshore Equip. Co*., 2023 WL 3149265, at *11 (C.D. Cal. Mar. 3, 2023), *reconsideration denied*, 2023 WL 4203512 (C.D. Cal. May 18, 2023); *see also* ER-7.

*Ins. Co*., 2 Cal. App. 5th 159, 170 (2016). Thus, the District Court's Order dismissing North River's suit must be overturned solely on that basis.

North River's Complaint otherwise at least "plausibly" asserts a claim for equitable subrogation under California law when taking all allegations in the Complaint as true. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021). The Complaint plainly sets out the elements of North River's equitable subrogation claim as follows: (1) the insured suffered a loss for which James River was liable (ER-97 ¶ 36); (2) North River compensated the insured for that loss (*id*.); (3) the insured has an existing, assignable cause of action against James River and could have asserted that action if it had not been compensated by North River (*id*. ¶ 37); (4) North River suffered damages caused by James River's breach of its duty to settle (ER-98 ¶ 39); (5) justice requires that the loss be entirely shifted from North River to James River (*id*. ¶ 40); and (6) North River's payment was reasonable and not voluntary (ER-97 ¶ 34, ER-98 ¶ 41). *See supra* 16–17.

Accordingly, this Court should overturn the District Court's order dismissing Appellant's suit.

## IV. UNDER NEVADA LAW, NORTH RIVER'S SUIT IS NOT BARRED AS A MATTER OF LAW

Even under Nevada law, James River's motion to dismiss fails. Where, as here, the state's highest court has not yet decided an issue, "the task of the federal courts is to predict how the state high court would resolve it." *Giles v. GMAC*, 494

F.3d 865, 872 (9th Cir. 2007). "In answering that question, this court looks for 'guidance' to decisions by intermediate appellate courts of the state and by courts in other jurisdictions." *Id*. Although a district court may consider an unpublished decision for its persuasive value, if any, a nonbinding opinion is not dispositive of how the state high court would rule.[5] *Emp'rs Ins. of Wausau v. Granite St. Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003).

Here, the District Court erroneously relied upon two related Nevada Supreme Court unpublished decisions—*St. Paul* and *Aspen*—to decide how the state high court would rule on James River's motion to dismiss. *St. Paul* and *Aspen* are inapposite to the facts presented by this case and do not reflect how a full Nevada Supreme Court would rule here in a binding decision. Instead, Nevada would likely follow the majority of states—including California—in recognizing equitable subrogation by an excess insurer against a primary insurer, even where the ultimate loss is within the insured's collective policy limits.

## A.   *St. Paul* and *Aspen* Are Inapplicable to North River's Suit

The District Court erred in applying *St. Paul* and *Aspen* to bar North River's claim because those unpublished decisions do not reflect how the Nevada Supreme

---

[5] The District Court apparently found that it *must* consider the unpublished decisions in its approximation of Nevada law. (ER-6.) Ninth Circuit caselaw is clear that a district court's ability to consider unpublished state appellate decisions is permissive. *See, e.g., U.S. Bank, N.A. v. White Horse Ests. Homeowners Ass'n,* 987 F.3d 858, 863 (9th Cir. 2021) ("When determining the substance of Nevada law, we *may* rely on unpublished Nevada Supreme Court opinions.").

Court would rule in this case. First, *St. Paul* involves a subrogation claim between same-level insurers, making it inapplicable to this dispute between an excess and primary insurer. Even though *Aspen* addressed equitable subrogation between an excess and primary insurer, only three justices decided *Aspen* and thus it is not persuasive as to how the Nevada Supreme Court would rule on this issue. Second, *St. Paul* makes no mention of any insurer asserting a reservation of rights—i.e., the right to assert a subrogated claim for the insured's loss. Unlike at the summary judgment stage in *St. Paul*, the Court here is required to accept as true North River's allegations that it did not act as a volunteer by reserving its rights to recoup its payment. Thus, this Court should not apply either decision to bar North River's claim here.

### 1. *St. Paul* is inapposite and *Aspen* lacks any precedential or persuasive value

In *St. Paul* and *Aspen*, a patron of a Las Vegas nightclub sued the two insured nightclub-hotels, Marquee and Cosmopolitan, for negligent and intentional torts after security members injured him while attempting to oust him from the club. *St. Paul*, 2022 WL 17543613 at *1. Marquee tendered the claim to both its primary insurer, Aspen, and its excess insurer, National Union, whose policies named Cosmopolitan as an additional insured. *Id*. Aspen and National Union jointly defended both parties. *Id*. Cosmopolitan also had its own primary insurer,

nonparty Zurich, and an excess insurer, St. Paul, who Cosmopolitan notified about its potential exposure about one month before trial.  *Id*.

At trial, the jury returned a verdict in favor of the patron for $160.5 million in compensatory damages.  *Id*.  Before reaching the punitive-damages stage, the four insurers collectively funded a confidential settlement with the patron for an amount that exhausted but did not exceed their collective policy limits.  *Id*.  After the settlement, Cosmopolitan's excess insurer, St. Paul, brought a subrogation claim against National Union and Aspen for, among other things, breach of the implied covenant of good faith and fair dealing for failing to settle the case within their policy limits.  *Id*.

National Union first moved for summary judgment on St. Paul's equitable subrogation claim.  *St. Paul Fire & Marine Ins. Co. v. Aspen Specialty Ins. Co.*, 2019 WL 13257683 (Nev. Dist. Ct., Oct. 15, 2019).  The trial court granted National Union's motion after National Union argued that there is "no subrogation of two excess carriers in two different towers."  *Id.*  A six-justice panel (short one justice) of the Nevada Supreme Court decided St. Paul's appeal.  *St. Paul*, 2022 WL 17543613.  The District Court's Order relied upon *St. Paul* and its reasoning to dismiss Appellant's suit.  (*See* ER-10–11.)  But *St. Paul* is inapplicable on its face because it involved equitable subrogation between same-level insurers with different named insureds.  Here, Appellant is an excess carrier seeking subrogation

against the primary insurer for claims against their mutual insured. Thus, the District Court erred in applying *St. Paul* to this case.

Aspen also moved for summary judgment on St. Paul's equitable subrogation claim. *St. Paul Fire & Marine Ins. Co. v. Aspen Specialty Ins. Co.*, 2020 WL 13616460 (Nev. Dist. Ct., Oct. 9, 2020). The trial court denied Aspen's motion because there were "questions of fact as to whether Aspen did not properly settle when it should have." *Id*. A three-justice panel decided Aspen's appeal in a four-page decision containing minimal reasoning. *Aspen*, 2023 WL 3185274. The *St. Paul* decision holding Cosmopolitan suffered no damages to which St. Paul could subrogate foreclosed St. Paul's equitable subrogation claim against Aspen as well. Whatever value an unpublished decision by the Nevada Supreme Court has, a case decided by only three justices that merely applied an earlier holding in the case to a second motion should have no persuasive value to this Court in deciding how the Nevada Supreme Court would decide whether Appellant's claim is barred as a matter of law accepting all of its allegations as true.

Because there is no decision in which the full Nevada Supreme Court has had an opportunity to address whether equitable subrogation exists between excess and primary insurers, this Court should look to California law on the issue, as the Nevada courts would do. *See supra* 17–18.

### 2. Unlike the plaintiff in *St. Paul*, North River involuntarily paid the insured's loss

Apart from its lack of precedential value to this case, *St. Paul* cannot be relied on to decide North River's subrogation right because the decision did not turn on whether the excess insurer's payment was voluntary. Because *St. Paul* was decided at the summary judgment stage, the court could decide on the undisputed material facts borne out through discovery whether St. Paul met its burden to establish its equitable subrogation claim, including whether it voluntarily paid the insured's loss.

An insurer is not a volunteer "if [it] pays the debt believing the debt must be paid to protect [its] interests, even though it may ultimately be determined payment was unnecessary." *Nat'l Sur. Corp. v. Public Serv. Mut. Ins. Co*., 2008 U.S. Dist. LEXIS 130955, *12–13 (collecting cases); *see also Genesis Ins. Co. v. Magma Design Automation, Inc*., 2015 WL 5123424, at *12 (N.D. Cal. Aug. 31, 2015), *aff'd*, 705 F. App'x 505 (9th Cir. 2017) ("Since [excess insurer] originally declined coverage under the [excess policy], [its] eventual payment was not 'voluntary.'"); *Aetna Life & Cas. Co. v. Ford Motor Co*., 50 Cal. App. 3d 49, 53–4 (1975) ("[O]ne acting in good faith in making payment under a reasonable belief that it is necessary to his protection is entitled to indemnity or subrogation, even though it develops that he in fact had no interest to protect."); *accord Laffranchini*, 39 Nev. at 55 (a volunteer is "one who thrusts himself into a situation on his own initiative,

and not one who becomes a party to a transaction upon the urgent petition of a person who is vitally interested, and whose rights would be sacrificed did he not respond to the importunate appeal.").

Here, as alleged in the Complaint, North River did not voluntarily pay its insured's obligation. *Supra* 10. Unlike the court in *St. Paul*, this Court must accept North River's allegations as true. North River contributed to the settlement only after James River refused repeated settlement demands *within* its $1 million policy limits, an unreasonable position given that James River's own defense counsel concluded that the settlement value *exceeded* $1 million. When two-plus years of litigation failed to produce a settlement, the underlying plaintiff raised the stakes, demanding a $5 million settlement. (ER-96 ¶ 28.) Once James River finally agreed to contribute its full limits of $1 million (*id*. ¶ 29), North River then paid the $4 million balance under a full reservation of rights to protect its own interests and those of its insured (*supra* 10). A payment made under a reservation of rights is not "voluntary." If North River had not offered to contribute to the settlement, it risked the prospect of bad-faith liability in the event the insured suffered a greater judgment at trial. Thus, although North River did not believe it owed any payment because of James River's bad-faith refusal to settle, North River funded the settlement and reserved the right to seek reimbursement of its payment to protect its own interests and those of its insured.

**B.    Subrogation Is an Equitable Remedy Not Subject to Bright-Line Rules**

With no decision on-point with the facts presented here, the Court must predict how the Nevada Supreme Court would decide Appellee's motion to dismiss.  The Nevada Supreme Court is unlikely to adopt the District Court's bright-line rule that there can be no equitable subrogation, as a matter of law, where the ultimate liability is within the collective policy limits.  Such a rigid approach is contrary to the equitable nature of a subrogation claim.  As the U.S. Supreme Court explained over a century ago: "The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties."  *Memphis & L. R. R. Co. v. Dow*, 120 U.S. 287, 301–02 (1887).  This foundational understanding of the nature of the claim aligns with Nevada's longstanding approach to equitable subrogation.  *See Laffranchini*, 39 Nev. at 56–7 ("The right of subrogation . . . is founded upon the facts and circumstances of the particular case."); *Am. Sterling*, 126 Nev. at 428 (subrogation is an "equitable remedy that requires the court to balance the equities based on the facts and circumstances of each particular case.").

The District Court was wrong to find that the Nevada Supreme Court would have dismissed North River's claim solely because the ultimate settlement amount did not exceed its limits.   Given the equitable nature of the relief and its

dependence on the facts and circumstances of each case, a subrogation claim cannot be barred as a matter of law solely on the basis that the settlement was within the collective policy limits. Such a blanket rule is even less likely to be issued at the motion-to-dismiss stage. Unlike the procedural posture of *St. Paul*, which had reached summary judgment, the facts and circumstances of North River's subrogation claim have yet to develop. North River's claim is not ripe for a dismissal order that went far beyond anything the Nevada Supreme Court had ever articulated.

Further, *St. Paul* did not hold that there can be no equitable subrogation between insurers as a matter of law, which is the practical result of the District Court's holding. The District Court held that under *St.* Paul, Nevada law does not recognize equitable subrogation where the insurers settle a claim against their insured for an amount within their collective policy limits. Under such a rule, an insured only suffers damages if there is a judgment (or settlement) that exceeds all of its available insurance. Only the amount that exceeds the collective insurance limits is the insured's "loss." But an equitable subrogation claim requires the subrogee (e.g., the excess insurer) to involuntarily *pay* the loss of the subrogor (e.g., the insured). If the only "loss" to the insured is the amount exceeding its *collective* policy limits, the payment made by the excess insurer exhausting its full policy limits is not covering the insured's "loss." The insured may have a claim

against the primary insurer that unreasonably failed to settle within its policy limits when presented with the opportunity to do so. But, because the excess insurer's payment is not covering the insured's "loss"—a necessary element of subrogation—the insured has no claim to which the excess insurer can subrogate. Nor would an excess insurer who pays the insured's "loss" in this scenario have subrogation rights because that insurer would be acting as a volunteer, given that it had no chance of liability beyond its policy limits and was not acting to protect its own interest. *See supra* 36–37. Thus, under the District Court's holding, Nevada would not recognize equitable subrogation between insurers in any situation.

Nothing in *St. Paul* supports the extreme conclusion that there can be no equitable subrogation between insurers as a matter of law. Had it wanted to be an outlier, the *St. Paul* court could have flatly held that Nevada does not recognize equitable subrogation between insurers. It did not. But the District Court here did. By applying *St. Paul* to this case, the District Court made that decision for Nevada, imposing a blanket rule that finds no support in either the Nevada Supreme Court's analysis or the laws of most other states in the Ninth Circuit. The District Court's improper application of *St. Paul* to this case requires reversal of its order dismissing North River's subrogation claim.[6]

---

[6] This is especially so to the extent the District Court relied on James River's claim that North River purportedly agreed with the decision not to settle, or any other facts appearing only in James River's motion. *Supra* 12.

## C. The Nevada Supreme Court Would Not Adopt *St. Paul*'s Flawed Holdings

The Nevada Supreme Court is unlikely to adopt the rule announced in *St. Paul* in a binding decision, even in analogous cases, because the decision misinterprets the authorities that underlie it. After recognizing that every insurer has a duty to protect its insured from unreasonable exposure to a judgment in excess of the insured's liability coverage limit, the Nevada Supreme Court nevertheless concluded that the insured suffered no damages because the insurers all settled within their collective policy limits. In so holding, the court misunderstood when an insured has been "injured" by an insurer's breach of its "duty to settle."

### 1. The *St. Paul* court misinterpreted authorities holding damages must exceed policy limits

The *St. Paul* court began by finding that an insurer's "'duty to settle' requires the insurer to protect the insured from unreasonable exposure to a judgment in excess of the insured's liability coverage limit to the extent an opportunity to settle arises." *St. Paul*, 2022 WL 17543613 at *5 (citing Restatement of Liability Insurance § 24 cmt. b (2019)). This comment section of the Restatement addresses an insurer's duty to settle to avoid an insured facing judgment excess of *that insurer's policy*, not all insurance that an insured may or may not have to cover the claim. As explained above, this is to align the incentives of the insurer with its insured and excess insurer, so that the primary insurer does

not "gamble" with the insured's money when handling the case. *Supra* 15; *see* Restatement of Liability Insurance § 24 cmt. b (2019). Thus, where a primary insurer violates this duty, the damages to the insured are the amount by which the judgment exceeds the primary carrier's limits, even if that insured has excess insurance.

The *St. Paul* court then found, "exhaustion of the policy limits prior to an excess judgment necessarily protects the insured from the harm that the duties purport to avoid." *St. Paul*, 2022 WL 17543613 at *2 (citing *Safeco Ins. Co. of Am. v. Super. Court of Contra Costa Cnty.*, 71 Cal. App. 4th 782 (1999)). The *St. Paul* Court characterizes *Safeco* as "concluding that the cause of action for bad faith refusal to settle arises only after a judgment has been rendered in excess of the policy limits." *Id.* The California Court of Appeal in *Safeco*, however, addressed whether an insured can sue an insurer for bad-faith refusal to settle before any judgment had been rendered against it. *Safeco*, 84 Cal. Rptr. 2d at 788. The decision did not address an action between multiple insurers. The court held that there must be final judgment because if the case goes to trial and the verdict is within the insurer's policy limits or is a complete defense verdict, then the insured suffers no damage and has no claim against the insurer. *Id.*; *see also Ace Am.*, 2 Cal. App. 5th at 170 (holding that the "final judgment" can be settlement). It is well-settled in California that an insured still has a claim against a primary insurer

for refusal to settle if the ultimate settlement amount exceeds the primary insurer's limits—even where the insured has excess coverage—and an excess carrier has subrogation rights if it pays the amount owed by the insured. *Ace Am.*, 2 Cal. App. 5th at 167 ("Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier . . . stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted.").

### 2. The *St. Paul* court ignored binding Nevada law on equitable subrogation

As the dissent in *St. Paul* explains, the majority misconstrued established Nevada subrogation law in holding Cosmopolitan suffered no damages to which St. Paul could subrogate because it did not suffer a loss exceeding its collective policy limits. *See St. Paul*, 2022 WL 17543613 at *6 n.6.

First, the dissent notes that the majority's reasoning that Cosmopolitan suffered no damages because of St. Paul's settlement contribution "fails to recognize that subrogation substitutes the parties *as if the subrogee had never assumed the subrogor's loss*." *Id.* at *5 (citing *Arguello v. Sunset Station, Inc*., 127 Nev. 365, 368 (2011)); *see, e.g., Valley Power Co. v. Toiyabe Supply Co*., 80 Nev. 458 (1964). In *Valley Power*, insured-corporations suffered losses due to financial crimes committed by their employees, for which they were fully compensated by

their insurer.  80 Nev. at 460.  That insurer then became subrogated to the insureds' claim against the tortfeasors.  *Id*.  As the Nevada Supreme Court in *Valley Power* explained, an insurer that pays its insured "in full for their claimed losses . . . [is] subrogated, by operation of law, to the rights, if any, which the insured may have had against the tortfeasor *before such payments were made*." *Id*. Even though the insureds in *Valley Power* were fully compensated by their insurer, with no loss exceeding its insurance policy limits, they still had a claim against the tortfeasor to which the paying insurer could subrogate.  This is because if their insurer had never stepped in to pay, the insureds could have pursued an action against their tortfeasor to recover their losses.  After the insurer's payment, the losses belong to the insurer.  The tortfeasor's liability does not disappear simply because the insured had the foresight to purchase insurance (or, in this case, excess insurance).

Second, the *St. Paul* court erroneously concluded the insurers' exhaustion of their policy limits provided Cosmopolitan "financial security, protection, and peace of mind," which is the purpose of conferring a "duty to settle" on an insurer.  *St. Paul*, 2022 WL 17543613 at *5–6. But, as the dissent correctly notes, this rule ignores established Nevada law that exhaustion of policy limits does not automatically foreclose an insured's damages under breach-of-contract or bad-faith theories.  *See Century Sur. Co. v. Andrew*, 134 Nev. 819, 825–26 (2018) (holding

that, in the context of an excess judgment, breach of the duty to defend subjects an insurer to liability for expectation and consequential damages, which may exceed the policy limits); *Miller*, 125 Nev. at 314 (an insurer's breach of the duty to settle subjects it to "all compensatory damages proximately caused by its breach," which may exceed the policy limits).

In *Miller*, the insured tortfeasor was subject to an adverse verdict in excess of its automobile insurance limits after the insurer failed to inform the insured of offers to settle that exceeded the policy limits. 125 Nev. at 306–7. The insurer appealed the jury's verdict in favor of the insured for its bad faith claims against the insurer. *Id.* at 307. The Nevada Supreme Court found that "the covenant of good faith and fair dealing includes a duty to adequately inform the insured of settlement offers" because "a primary insurer's duty to defend includes settlement duties and an insurer must give equal consideration to the insured's interest." *Id.* at 305. The Nevada Supreme Court explicitly purported to expand bad faith liability beyond solely circumstances in which an insurer rejects a settlement offer within the policy limits. *Id.* at 311. The court also "refuse[d] to adopt the absolute rule that a primary liability insurer's bad-faith liability ends upon a timely offer of the insured's policy limits." *Id.* Instead, "[i]f an insurer violates its duty of good faith and fair dealing . . . the insurer's actions can be a proximate cause of the insured's damages arising from a foreseeable settlement or excess judgment." *Id.* at 313–14.

*St. Paul* and *Aspen* found that because all four insurers offered their full policy limits to settle, the insured suffered no injury and therefore had no claim against National Union to which St. Paul could subrogate. *St. Paul* and *Aspen* are not binding authority for determining Nevada law, but *Valley Power*, *Andrew*, and *Miller* are. This Court must conclude that *St. Paul* and *Aspen* do not accurately reflect Nevada law because they should have found that Cosmopolitan did have a claim against National Union and Aspen—to which St. Paul could subrogate—even though the insurers exhausted their full policy limits.[7]

### 3. The rule in *St. Paul* creates incentives that harms insureds

The *St. Paul* court's conclusion that the insurers' exhaustion of their limits saves their insured from the same harm the "duty to settle" purports to prevent is also wrong. Allowing the insurer to avoid liability for the insured's excess loss excess by exhausting its policy limits does not align the interests of the insurer and insured in defending the claim. As long as the primary insurer knows that the insured has excess liability coverage, the insurer has an incentive to reject settlement offers for its policy limits, gambling that it can achieve a better result, while not risking any additional liability for losing that bet. *See supra* 15. Such a rule does not protect insureds with the "fortuity" of having "obtained more than

---

[7] Despite the fact that the Nevada Supreme Court recently decided *St. Paul*, it is reasonable to conclude that the Court would nonetheless not follow its holding given the Court's new composition, including that one of the dissenting justices in *St. Paul* is now the Chief Justice.

one applicable policy." *St. Paul*, 2022 WL 17543613 at *5 (dissent). It punishes those that obtained and paid for additional insurance coverage by requiring those insureds to exhaust the additional coverage for which they paid premiums, whereas those with insufficient coverage can transfer liability entirely to the wrongdoer insurer.

### D. Nevada Would Likely Follow California and the Majority of States in Recognizing Equitable Subrogation Between Insurers

As the District Court noted, Nevada courts often look to California law for guidance when deciding issues of first impression. (ER-11 n.4); *see generally St. Paul*, 2022 WL 17543613 (citing California law on equitable subrogation throughout reasoning). Because the only Nevada Supreme Court decision on this issue is unpublished, contains fundamental flaws, and relies on California law for its foundation, the Court should look to California law for guidance in determining whether to categorically bar an action for equitable subrogation where the ultimate loss to the insured was within its collective insurance policy limits. California does not require settlements or judgments excess of all available insurance. *See, e.g., Ace Am*., 2 Cal. App. 5th at 170.

Again, the practical effect of the District Court's interpretation of *St. Paul* is that Nevada law does not recognize equitable subrogation between insurers. *Supra* 39–40. Nevada would be one of the only states to not recognize equitable subrogation between insurers in these circumstances. In the Ninth Circuit alone,

besides California, at least Arizona, Hawaii, Oregon, and Washington have adopted equitable subrogation rights of an excess insurer against a primary carrier. *See Millers Cas. Ins. Co., of Texas v. Briggs*, 100 Wash. 2d 9 (1983); *Travelers Cas. & Sur. Co. v. Am. Equity Ins. Co*., 93 Cal. App. 4th 1142 (2001); *Cal. Cas. Ins. Co. v. State Farm Mut. Auto. Ins. Co*., 185 Ariz. 165 (Ct. App. 1996), *corrected* (Feb. 28, 1996); *School Dist. No. 1, Multnomah Cnty. v. Mission Ins. Co*., 58 Or. App. 692 (1982); *St. Paul Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co*., Hawaiʻi 449 (2015). Indeed, the majority of states throughout the country give excess insurers equitable subrogation rights against primary insurers. Litig. & Prev. Ins. Bad Faith § 7:9 ("The courts are all but unanimous in holding that a paying excess carrier, as subrogee of the insured's rights, may maintain an action against a primary carrier for the latter's bad faith, excess liability resulting from breach of its settlement duties, or defense duties, or both. The vehicle used has largely been that of equitable subrogation."); *see, e.g., Nat'l Sur. Corp. v. Hartford Cas. Ins. Co*., 493 F.3d 752, 756 n.2 (6th Cir. 2007) (explaining subrogation between primary and excess insurers is the "overwhelming majority" rule and citing cases from 27 jurisdictions in support).

Without a published decision to the contrary, the Court should conclude that Nevada would follow the majority position that excess insurers can have equitable subrogation claims against primary insurers, even where the ultimate settlement or

judgment is within the collective policy limits, as long as the excess insurer did not act as a volunteer.

## CONCLUSION

This Court should reverse the District Court's order dismissing North River's claim for equitable subrogation.

Dated: December 6, 2023

O'MELVENY & MYERS LLP

By: /s/ *Sabrina H. Strong*
SABRINA H. STRONG (SB#200292)
ZOHEB P. NOORANI (SB#253871)
400 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Attorneys for The North River Insurance Company*

## STATEMENT OF RELATED CASES

Pursuant to 9th Cir. R. 28-2.6, Appellant states that it is unaware of any related cases currently pending in this Court.

Dated: December 6, 2023

By: _/s/ Sabrina H. Strong_
      Sabrina H. Strong
      O'MELVENY & MYERS LLP

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-55757

I am the attorney or self-represented party.

**This brief contains** 12,454 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Sabrina H. Strong **Date** 12/06/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on the 6th day of December, 2023, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the appellate CM/ECF system.

Dated: December 6, 2023       By:   _/s/ Sabrina H. Strong_
                                      Sabrina H. Strong
                                      O'MELVENY & MYERS LLP